STRYKER v. POLK COUNTY, AND TIFFIN, TREASURER.

1. Des Moines river lands: LIABILITY TO TAXATION. The lands lying between the Raccoon fork of the Des Moines river and the northern boundary of the State of Iowa, included in the list originally certified to the State under the act of Congress of August 8, 1846, granting certain lands to the territory of Iowa to aid in the improvement of the Des Moines river in said territory, which were embraced in the joint resolution of March 2, 1861, and afterward (July 14, 1866) duly certified to the State, are liable to taxation in the hands of *bona fide* purchasers from the State, or their grantees, for all years subsequent to the date of the conveyance from the State to such purchasers.

2. —— JOINT RESOLUTION OF MARCH, 1861. Prior to the joint resolution of March 2, 1861, the *technical*, but not the *absolute*, title to these lands, within the meaning of our statute exempting from taxation the property of the federal government, was in the United States. That resolution recognized the equitable title of the *bona fide* purchaser from the State, and operated, by relation, upon it from the time it passed from the State, to the extent of rendering these lands liable to taxation from the date of their conveyance to such purchasers.

*Appeal from Polk District Court.*

FRIDAY, APRIL 12.

PLAINTIFF appeals from an order refusing to grant an injunction, his petition making the following case:

On the third day of May, 1858, the State conveyed to the Des Moines Navigation and Railroad Company many tracts of land, including that which plaintiff in his petition claims as exempt from taxation for 1859, and all subsequent years. In October, 1859, the company, by deed of general warranty, conveyed the same lands to the petitioner. The conveyance, being by warranty, was made by the State, claiming to be the owner, and to have title under and by virtue of the act of Congress of August, 1846, entitled "An act granting certain lands to the territory of Iowa, to aid the improvement of the navigation

of the Des Moines river in said territory." After the passage of this act, and until the decision of the Supreme Court of the United States, in December, 1859, the executive and official agents of the federal and State governments, as also the said company, regarded and treated the grant in said act contained " as embracing, including and conveying to the State of Iowa all unappropriated lands lying in the alternate sections designated by odd numbers, within five miles of the Des Moines river, from its mouth to its source; and a great portion of said lands were, by the proper and duly constituted officers and agents of the United States, certified to the said State of Iowa as being a part of said grant, and as passing to the said State under and by virtue thereof, for the purposes in said act contemplated."

By the decision of the Supreme Court of the United States aforesaid, it was held that this grant did not extend north of the junction of the Raccoon with the Des Moines river; and, on the 2d of May, 1861, Congress, for the purpose of giving effect to and carrying out the construction which had been given to said grant by the executive authorities of the State and federal governments, passed a joint resolution, transferring and relinquishing to said State, for the use of *bona fide* purchasers under said State, " all the title which the United States still retains in and to all the lands so treated and regarded as included in said grant, and which had been certified to the State as a part of the grant, by the officers of the United States."

In July, 1862, Congress passed a further act, entitled " An act confirming a land claim in the State of Iowa and for other purposes;" the substance of which was, that the grant of August 8, 1846, was extended so as to include the alternate sections (designated by odd numbers) within five miles of said river, between the Raccoon fork and the northern boundary of the State. There were

some other provisions in said act, not, however, material to the question now before us.

On the 22d of June, 1862, the commissioner of the general land-office addressed a circular to the Governor of this State, calling attention to the legislation of Congress, and requesting him to furnish a list of the tracts of land referred to in the joint resolution of March, 1861, "held by *bona fide* purchasers of the State of Iowa," * * "specifying the date of sale, name of purchaser, consideration, and date of patent, order of conveyance by the State, with all the essential particulars connected with the transaction." The Governor, in compliance with this request, forwarded a certified list, and, on the 14th of June, 1866, this list was duly certified by the land commissioner and approved by the secretary of the interior.

The land described in plaintiff's petition is included in this certificate; is above the Raccoon fork; is more than fifteen miles from any of the railroads mentioned in the act of May 15, 1856, "An act granting lands to aid the State in the construction of said railroad," etc.; and was in the list originally certified to the State under the act of August 8, 1846, and referred to in the joint resolution of March, 1861.

The question made, as will be seen from the opinion, is, whether the land was liable to taxation until the lists were returned certified in 1866; and if not for all, then for what years.

*J. M. Elwood* for the appellant.

*Jno. Mitchell* for the appellee.

WRIGHT, J.—The question in this case is not, when did plaintiff acquire a full, clear, complete and indefeasible

1. DES MOINES RIVER LANDS: liability to taxation. title to this land. Nor have we anything to do with any possible claim of title on the part of any other person or corporation. In cases of this character it would be without precedent, and in violation of the plainest rights of property, to undertake to adjudicate possible or probable conflicting claims. Our duty is simply to inquire whether this land was the property of the United States, or of the State, for any of the years named, within the meaning of our revenue laws; for, if so, it was exempt for such year or years. Or, to state the proposition in another form, whether, under said law, any person had an interest therein liable to taxation. For the law is, aside from the exemptions, that all property, real and personal, is subject to taxation; and this includes lands bought from the United States and from this State, and whether bought on credit or otherwise; and all rights thereto and interest therein, equitable as well as legal. The policy of the law is to make all property, not exempt by express enactments, bear its due proportion of the burdens of taxation.

Plaintiff claims that he was a *bona fide* purchaser under the State of Iowa, and hence, is clearly within the language of the joint resolution of November, 1861. His title, thus taken from the State, has never failed, but, he admits, is now, by reason of the subsequent legislation of Congress and this State, perfect and complete. The equity, at least, acquired by the original certificate from the federal authorities, and the deed from the State, formed the basis upon which he now claims a perfect title. Such a case is very different from one where the taxing power insists upon imposing the burden, and, at the same time, denies that any title of any kind has ever passed from the State or United States.

Prior to 1859, by the concurrent action and by the construction, up to December of that year, given to the act of

August, 1846, plaintiff had all the needed—all the usual evidence of title. The decision of the Supreme Court overturned this construction, and, if there had been no further legislation, plaintiff would, we may admit, have been without title. But Congress, in 1861, made, not a new grant, but, for the purpose of giving effect to and carrying out the construction placed upon the original act, relinquished to the State, for the use of *bona fide* purchasers, " all the interest which the United States still retained." If plaintiff, from that time, did not have a taxable interest in this land, we do not well see how he could acquire it. He held under a deed from the State; the State claimed under the original grant, the lists being duly certified; he was a " *bona fide purchaser*," and the title still retained by the United States was relinquished to the State for his use. The subsequent action on the part of the State and federal authorities was necessary, that the proper officers might know the specific tracts thus held by *bona fide* purchasers. The United States had already, in the manner contemplated by the act of 1846, parted with its title; the State, upon the faith of the title thus acquired, had sold and conveyed, and the joint resolution was intended as a matter of justice and right to secure and quiet *bona fide* purchasers in their titles, unsettled as they were by the decision of the Supreme Court. And if, from this time forward, such purchasers were not liable to the burdens, neither ought they to claim the rights and advantages of owners; and yet, should the question be presented in the latter form, or should this right be denied, we hazard nothing in saying that this legislation would be found by those in plaintiff's position, at once to have a wonderfully curative power.

Conceding, then, that this land was most clearly liable to taxation, after March, 1861, it only remains to inquire whether it was liable prior to that

2. —— joint resolution of March, 1861.

time. The deed was made by the State to the company, in 1858, and by the company to plaintiff in 1859. If taxable in his hands, so it was in the hands of the company, and hence for 1859; and our opinion is, that, holding the title as he did, the joint resolution of 1861, for the purpose of the present inquiry, made it as good from the time of the first conveyance by the State as it was after such congressional action. Plaintiff took title, claimed under it, and this joint resolution recognized the validity of this claim; this, if it had any effect, by relation operated upon the title from the time it passed from the State.

The technical legal title may have remained in the United States; but plaintiff certainly had a right which had been recognized by the concurrent action of the authorities. And if it be conceded that plaintiff could not, in a judicial forum, have enforced his right, yet, as the federal government did afterward relinquish to him all interest, the effect was, not to make a new grant, but to recognize the equitable force of the one under which plaintiff had before that time claimed. The *absolute* title, within the meaning of our statute exempting from taxation the property of the federal government, was not in the United States. By the decision of one department of the government, the technical title was held to be in the federal government; a second had, by the supposed necessary forms, parted with the title, and the third, having full power, had carried out the action of the second; and thus, as plaintiff now claims (taken in connection with the act of certifying the lists in 1866), invested him with the indisputable legal title. The interest held before. however, was taxable; and as clearly so as after the relinquishment. The exception is in favor of the United States, and not of one holding and claiming under it. For cases in this State bearing upon the point made, see *Stockdale*

v. *Tr. of Webster Co.*, 12 Iowa, 536; *Homestead Co.* v. *Ganoe*, 21 Id.; *Dub. & Pac. Railroad Co.* v. *Webster Co.*, Id.; *Adams* v. *Beale*, 19 Id., 61; *Fremont Co.* v. *B. & M. R. R. Co.*, present term.

Affirmed.

### WEDNESDAY, JUNE 12.

Per Curiam.—In this case an opinion was announced at the last April Term, affirming the judgment of the court below. Appellant now moves for a modification of the order of affirmance, so far as to relieve plaintiff from all or a portion of the penalty and interest accruing or chargeable on such delinquent taxes.

We concede that there are strong equitable reasons for the position that plaintiff is entitled to this relief in some direction. The remedy, however, if it exists, is with the board of supervisors. To that tribunal appellant should go in the first instance. The bill in this case asks no such relief. The question was never made in the District Court; and whatever might be our views upon a proper case, we unite in the conclusion that, upon the record and facts before us, this motion must be overruled.